# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Megan C. Lunzer,

        Plaintiff,

Case No. 17-cv-1756 (SER)

v.

**ORDER**

Nancy A. Berryhill,[1]
Deputy Commissioner of Operations

        Defendant.

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Megan C. Lunzer ("Lunzer") seeks review of the Deputy Commissioner of Operations of the Social Security Administration's (the "Commissioner") denial of her application for disability insurance benefits ("DIB") and social security income ("SSI"). *See* (Compl. for Judicial Review, "Compl.") [Doc. No. 1 ¶ 1]. The parties filed cross-motions for summary judgment. (Pl.'s Mot. for Summ. J.) [Doc. No. 12]; (Def.'s Mot. for Summ. J.) [Doc. No. 14]. For the reasons set forth below, the Court denies Lunzer's Motion for Summary Judgment and grants the Deputy Commissioner's Motion for Summary Judgment.

---

[1] Nancy A. Berryhill ("Berryhill") is now the deputy of commissioner for operations, performing duties and functions not reserved to the commissioner of Social Security. *Deputy Commissioner of Social Security*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner.html (last visited Apr. 4, 2018). But because she continues to "lead the Social Security Administration as [it] await[s] the nomination and confirmation of a Commissioner" and because there appears to be no other acting commissioner, the Court will continue to identify Berryhill as the defendant in this case. *See id.*; *see also* Fed. R. Civ. P. 25(d).

## I.    BACKGROUND

### A.    Procedural History

Lunzer filed for SSI and DIB on September 20, 2011, and July 11, 2012, respectively. (Admin. R.) [Doc. No. 11 at 306, 310]. She cited an alleged onset date ("AOD") of September 30, 2010. (*Id.* at 331). Lunzer claimed disability due to depression, pectus excavatum, postural orthostatic tachycardia syndrome ("POTS"), inappropriate sinus tachycardia, syncope, blood pressure issues, migraines, post-traumatic stress disorder ("PTSD"), and several other conditions. (*Id.* at 378). Lunzer's claims were denied initially and upon reconsideration. (*Id.* at 194, 203). Following a hearing, the administrative law judge (the "ALJ") denied benefits to Lunzer on December 23, 2013. *See* (*id.* at 163–78). The Appeals Council granted review of the ALJ's decision and remanded the case to the ALJ for a new hearing. (*Id.* at 186–90). On remand, the ALJ had a hearing and again denied benefits to Lunzer on October 30, 2015. *See* (*id.* at 7–27).

Following this decision, the Appeals Council denied Lunzer's request for review, rendering the ALJ's decision final. (*Id.* at 1); 20 C.F.R. § 404.981.[2] Lunzer initiated the instant lawsuit on May 25, 2017. (Compl.)

### B.    Factual Background

The Court has reviewed the entire administrative record, but summarizes only the evidence necessary to provide context for the issues before the Court. Specifically, Lunzer's arguments are limited to issues arising from POTS, syncope, and blood pressure, and consequently, the Court's review of Lunzer's medical evidence is limited to these conditions.

---

[2]    Lunzer applied for both DIB and SSI, which each have a separate set of regulations. *See* 20 C.F.R. Pt. 404; 20 C.F.R. Pt. 416. The regulations referred to in this Order have parallel citations in each part. *Compare* 20 C.F.R. § 404.981, *with* 20 C.F.R. § 416.1481. For ease of reference, the Court will only refer to the regulations regarding DIB. *See* 20 C.F.R. Pt. 404.

### 1.    Lunzer's Background and Testimony

As of her AOD, Lunzer was twenty-three years old, making her a younger individual. (Admin. R. at 306); *see* 20 C.F.R.§ 404.1563(c). Lunzer completed high school and college. (Admin. R. at 53–54). She has experience working as a recreation supervisor, food court employee, and recreation and programs assistant. (*Id.* at 367).

At the hearing before the ALJ, Lunzer testified as follows. She is currently unemployed and the last place she worked for any substantial period of time was as a guest services manager for the city of Crystal. (*Id.* at 60–61). She worked for Crystal as a part-time employee and was unable to work full-time due to her symptoms. (*Id.*). She tried to babysit, but could only work for "an hour to two maximum" at a time. (*Id.* at 61, 95).

Lunzer stated that she began experiencing symptoms in high school. (*Id.* at 56). She testified that she was an athlete in high school, but found that she was having trouble breathing and experienced chest pain. (*Id.*). Since then, her symptoms have gotten worse. (*Id.* at 58). She experiences visual disturbances when she stands up, and testified that she feels lightheadedness, fatigue, and headaches daily. (*Id.* at 63–64). Lunzer is able to do basic daily activities such as cook and clean, but states that some days she is unable to be upright for more than fifteen minutes. (*Id.* at 49).

Lunzer experienced blood pooling in her legs; laying down alleviates this issue, but compressive stockings did not help the condition. (*Id.* at 49–50, 91). Lunzer has not driven a vehicle for some time and feels unsafe driving. (*Id.* at 67).

Lunzer also testified that she had been diagnosed with a mood disorder, PTSD, anxiety, and opioid dependence and remission. (*Id.* at 93). Most of those conditions have improved. (*Id.*

at 54). She has continuing anxiety stemming from the uncertainty of her diagnosis. (*Id.*). She takes anxiety medication and feels that her symptoms improve with the medication. (*Id.*).

### 2.    Medical Evidence

Lunzer visited a pediatric surgeon on July 1, 2010, with complaints of shortness of breath with physical activity. (*Id.* at 780). She experienced these symptoms throughout her childhood and adolescent years. (*Id.*). A CT scan demonstrated pectus excavatum with an index measured at 6.7 and marked displacement and compression of the heart.[3] (*Id.* at 781). Lunzer underwent surgery to repair her pectus excavatum on July 7, 2010. (*Id.* at 778). The surgeon assessed "possible nerve injury secondary to surgery." (*Id.* at 994). He prescribed her gabapentin to help with the pain.[4] (*Id.*). On January 15, 2011, Lunzer recorded sinus tachycardia with a resting heart rate at ninety-six beats per minute and blood pressure of 139/90. (*Id.* at 958). She obtained a Holter monitor to evaluate her heart rate.[5] (*Id.* at 959).

On February 14, 2011, Lunzer was admitted to the emergency room after reporting three separate episodes of syncope, the last involving her hitting her head on a dresser.[6] (*Id.* at 683). Her Holter monitor "demonstrated 48 to 171 beats per minute." (*Id.*). She was not wearing her event monitor during her episodes of syncope. (*Id.* at 683–84). The doctor stated, "[Lunzer's]

---

[3]    Pectus excavatum is "[a] hollow at the lower part of the chest caused by a backward displacement of the xiphoid cartilage." *Pectus excavatum,* Stedman's Medical Dictionary 663940, Westlaw (database updated Nov. 2014).

[4]    "Gabapentin works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system." *Gabapentin (Oral Route),* Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-2 0064011 (last updated March 1, 2017).

[5]    A Holter monitor is "a technique for long-term, continuous usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice." *Holter monitor,* Stedman's Medical Dictionary 558120, Westlaw (database updated Nov. 2014).

[6]    *Faint*, Stedman's Medical Dictionary 318730, Westlaw (database updated Nov. 2014) (defining "faint" as "an episode of syncope").

syncope is unlikely related to rapid heart rate," and that "her symptoms of nausea, lightheadedness, [and] sweating . . . correlate more with neurocardiogenic syncope."[7] (*Id.* at 686).

On May 27, 2011, Lunzer had a loop recorder implanted.[8] (*Id.* at 569). Over the next several months, she reported extreme depression and more frequent syncope events. *See, e.g.,* (*id.* at 1195–96, 1193–94, 1186–88, 1181–82, 1179–80, 1176–77, 1173–74, 1169–70, 1167–68, 1165–66) (showing Lunzer's distress stemming from uncertainty in her medical diagnosis as well as syncope events as frequent as three times per week). On July 10, 2012, Lunzer underwent a neurological exam and the neurologist stated "I do not think [her syncope events][are] necessarily due to a postural tachycardia syndrome. . . because her spells may occur when she is not standing." (*Id.* at 1104). She opined that Lunzer's condition was "a certain hemodynamic instability with labile blood pressure and heart rate." (*Id.*).

On July 16, 2012, Lunzer underwent a tilt table test.[9] *See* (*id.* at 1120–22). She presented with a baseline sinus rhythm of sixty-six beats per minute and blood pressure of 115/60. (*Id.* at

---

[7]     "Neurocardiogenic syncope . . . is defined as a syndrome in which triggering of a neural reflex results in a usually self-limited episode of systemic hypotension characterized by both bradycardia (asystole or relative bradycardia) and peripheral vasodilation . . . [and is] caused by an abnormal or exaggerated autonomic response to various stimuli, of which the most common are standing and emotion. The mechanism . . . involves reflex mediated changes in heart rate or vascular tone." Carol Chen-Scarabelli & Tiziano M Scarabelli, *Neurocardiogenic syncope*, 329 BMJ 339, 336–341 (2004).

[8]     "An implantable loop recorder is a type of heart-monitoring device that records your heart rhythm continuously for up to three years." *Implantable loop recorder*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/implantable-loop-recorder/pyc-20384986 (last updated March 27, 2018).

[9]      A tilt table test involves "a table with a top capable of being rotated on its transverse axis so that a patient lying on it can be brought into the erect position as desired; used in experimental investigation and in physical therapy," and monitoring by "catheterization, echocardiography, electrophysiologic measurements, electrocardiography, or mechanocardiography." *Tilt table*, Stedman's Medical Dictionary 894800, Westlaw (database updated Nov. 2014); *id.* 908700, (Tilt test).

1120). Her upright tilt test produced a sinus rhythm of sixty-three beats per minute with a blood pressure of 77/47. (*Id.* at 1121). The electrophysiologist stated that the tilt test was "positive for signs of POTS during [Lunzer's] passive tilt." (*Id.*). Lunzer's event recorder showed "no significant bradycardic or arrhythmogenic episodes," and the electrophysiologist found "no arrthymogenic evidence that would be causing [Lunzer's] syncope. . . spells[.]" (*Id.* at 1121–22).

On November 27, 2012, Lunzer's heart rate was measured and found to range from "the 50s range to 198 beats per minute even while she is sitting." (*Id.* at 1430). Her blood pressure and heart rate fluctuate "dramatically" with position change; lying down her blood pressure was 135/79, and her pulse was 105 beats per minute; standing the blood pressure was 101/77, and her pulse was 152 beats per minute. (*Id.*).

Starting December 20, 2012, Lunzer began seeing Joseph Pennington, MD ("Dr. Pennington"), a POTS specialist. (*Id.* at 1309). Dr. Pennington diagnosed her with dysautonomia.[10] (*Id.* at 1310, 1319). On December 4, 2013, Lunzer had a pacemaker implanted. (*Id.* at 1512). She reported that her symptoms initially improved, but eventually worsened. *See, e.g.*, (*id.* at 1519, 1674, 1774, 1777, 1780, 1730, 1864) (showing that Lunzer eventually began to experience venous congestion in the legs, reported severe migraines, frequent syncope events, and became dizzy up to twenty times per day).

Lunzer saw several other treating physicians regularly. On February 27, 2012, Lunzer saw Mark Prebonich, MD ("Dr. Prebonich"), for the first time. (*Id.* at 1089–93). On May 31, 2012, Dr. Prebonich completed a disability recommendation questionnaire in which he opined that Lunzer had been unable to work and earn money since June 1, 2010, and was currently bed-

---

[10] Dysautonomia is "[a]bnormal functioning of the autonomic nervous system." *Dysautonomia*, Stedman's Medical Dictionary 271800, Westlaw (database updated Nov. 2014).

confined for three to five days per week. (*Id.* at 1088). Dr. Prebonich noted that Lunzer experienced dizziness and syncope that are exacerbated by her dysautonomia. (*Id.*).

Starting on January 9, 2013, Lunzer was treated by Eun Kim, MD ("Dr. Kim"), a family physician. (*Id* at 1330). Dr. Kim treated her for kidney stones and migraines. (*Id.*). On October 2, 2013, Dr. Kim completed a questionnaire in which he opined that Lunzer's conditions made her incapable of performing any kind of work, and that she would be unable to walk or sit for any amount of time. (*Id.* at 1465–68). On February 27, 2014, Kathleen Willey, MD ("Dr. Willey"), submitted a form medical opinion stating that Lunzer's conditions will last "[m]ore than 45 days" and that she will not be able to perform "any employment in the foreseeable future." (*Id.* at 1664).

### 3.  State Medical Expert Opinion

At Lunzer's eligibility hearing, the ALJ called Andrew Steiner, MD ("Dr. Steiner"), a medical expert in the field of physical rehabilitation, to review the record and testify. (*Id.* at 13, 100). Dr. Steiner stated that he had no bias for or against Lunzer. (*Id.* at 101–02). He testified that Lunzer had abnormal aortic and mitral valves, but an overall well-functioning cardiac system. (*Id.* at 103). Steiner observed that the readings from Lunzer's loop recorder were "essentially unremarkable," and that the readings taken by Dr. Pennington were "normal in regards to pulse and blood pressure." (*Id.* at 103–04).

Dr. Steiner opined that he did not see sufficient evidence that Lunzer's impairments met any Listing. He stated,

> We don't have the kinds of heart changes, arrhythmias or brady[cardia] or any other kinds of disturbance or blood pressure changes that would be at a listings level of documentation. This is mainly a record of reports of lightheadedness or pre-syncope or syncope based [on] a paucity of actual physical findings to support an ongoing severe problem.

(*Id.* at 105). Based on these observations, Dr. Steiner opined that Lunzer did not meet any of the neurological or cardiovascular listings. (*Id.*). He concluded that Lunzer was capable of performing sedentary work with only light lifting. (*Id.*).

### C.    The ALJ's Decision

Consistent with the Social Security Administration's regulations, the ALJ conducted the five-step eligibility analysis. (*Id.* at 166–78, 10–27); *see* 20 C.F.R. § 404.1520(a)(4). The ALJ found that Lunzer had the following severe impairments: depression, anxiety, pectus excavatum, POTS, dysautonomia, and asthma. (Admin. R. at 13). The ALJ found that Lunzer did not meet any of the Listings and determined that Lunzer had the residual functional capacity ("RFC") to perform sedentary work with limitations on standing or walking, no work with exposure to high concentrations of air pollutants, and no work around dangerous, unprotected heights or hazardous machinery. (*Id.* at 15). The ALJ found that although Lunzer was unable to perform her past relevant work, there were jobs that exist in significant numbers in the national economy that she can perform. (*Id.* at 25–26). Therefore, the ALJ concluded that Lunzer was not disabled. (*Id.* at 27).

## II.    DISCUSSION

### A.    Legal Standard

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole." *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (internal quotation marks omitted). The Court's task is limited "to review[ing] the record for legal error and ensur[ing] that the factual findings are supported by substantial evidence." *Id.*

This Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).

A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

### B.    Analysis

Lunzer argues that the ALJ erred in finding that Luzner did not meet the Listing for recurrent arrhythmias and that the ALJ erred in failing to give controlling weight to several of Lunzer's treating physicians. *See* (Pl.'s Mem. in Supp. of Mot. for Summ. J., "Lunzer's Mem. in Supp.") [Doc. No. 13 at 18–38].

### 1.    Listing 4.05 – Recurrent Arrhythmias

A claimant meets Listing 4.05 if he or she has

> [r]ecurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled . . . recurrent . . . episodes of cardiac syncope or near syncope . . . despite prescribed treatment . . . and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (See 4.00F3c).

> [4.00F3]c. For purposes of 4.05, there must be a documented association between the syncope or near syncope and the recurrent arrhythmia. The recurrent arrhythmia, not some other cardiac or non-cardiac disorder, must be established as the cause of the associated symptom. This documentation of the association between the symptoms and the arrhythmia may come from the usual diagnostic methods, including Holter monitoring (also called ambulatory electrocardiography) and tilt-table testing with a concurrent ECG.

20 C.F.R Pt. 404, Subpt. P, App. 1 §§ 4.05, 4.00F(3)(c). Lunzer argues she meets this Listing because objective medical evidence shows her "POTS led to syncope, fatigue, and other

symptoms." (Lunzer's Mem. in Supp. at 22). Lunzer further argues that if she does not meet the Listing, her "combination of impairments is medically equivalent to that Listing" and the ALJ "provided no analysis regarding Listing § 4.05, whether Lunzer meet[s] or medically equal[s] the Listing." (*Id.* at 22, 24).

The ALJ stated that Lunzer did not have an impairment or combination of impairments that meets or medically exceeds any Listing. (Admin R. at 13). Although the ALJ did not specifically reference Listing 4.05, he explained that "[t]he cardiac [L]istings were . . . considered." (*Id.*).

### a.    Legal Standard

"The claimant has the burden of proving that his impairment meets or equals a [L]isting." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010). "For a claimant to show that her impairment matches a listed impairment, she must show that she meets all of the specified medical criteria." *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004). An impairment that satisfies only some criteria, no matter how severe, does not meet or equal a Listing. *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).

### b.    Analysis

In various places, the medical evidence demonstrates that Lunzer had some of the elements of Listing 4.05, namely, recurrent and uncontrolled episodes of cardiac syncope or near syncope despite prescribed treatment. *See* (Admin. R. at 1179) (blacking out two or three times per week); (*id.* at 1120–22) (tilt test produced abnormal presyncope and was consistent with POTS); (*id.* at 1730) (syncope spells continued after Lunzer had a pacemaker implanted); (*id.* at 1993) (Dr. Pennington's September 2015 opinion that Lunzer is unable to work at any kind of job due to, *inter alia*, frequent and uncontrollable syncope). The record does not demonstrate,

however, that Lunzer ever met all of the specified criteria in the Listing. *See Harris*, 356 F.3d at 928. Notably absent is a documented association between the recurrent arrhythmia and the syncope or near syncope required in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00F(3)(c). Dr. Steiner, the medical expert at Lunzer's hearing, testified that he found Lunzer did not meet Listing 4.05 because "there's no evidence of a rhythm abnormality leading to syncope." (Admin. R. at 74).

The objective medical evidence is consistent with Dr. Steiner's assessment. *See, e.g.,* (*id.* at 549) ("On [Lunzer's] Holter monitor there were episodes of sinus tachycardia but no other significant arrhythmias that would correlate with her symptoms."); (*id.* at 686) (electrophysiologist's opinion that, because Lunzer's heart rate did not exceed 160 during a syncope episode, "her syncope is unlikely related to rapid heart rate"); (*id.* at 1121–22) (report following tilt test finding "no arrhythmogenic evidence that would be causing [Lunzer's] syncope . . . spells"); (*id.* at 1233) (review of Lunzer's Holter monitor showing sinus rhythm during syncopal events.).

Lunzer argues that Dr. Pennington and Dr. Kim provide the requisite evidence of association between syncope and arrhythmia to meet Listing 4.05. (Lunzer's Mem. in Supp. at 21–24). The Court finds this argument unpersuasive. Listing 4.05 requires documentation by a Holter monitor or another appropriate, medically acceptable test. 20 C.F.R Pt. 404, Subpt. P, App. 1 § 4.05. Allowing a doctor's opinion to substitute for objective medical testing is contrary to the plain meaning of Listing 4.05, and Lunzer has failed to identify any authority holding otherwise. As described above, the objective, medically acceptable evidence that is available does not document the necessary association between syncope and arrhythmia.

In the alternative, Lunzer argues that if she doesn't meet the Listing, her symptoms are medically equivalent to the Listing. (Lunzer's Mem. in Supp. at 22). Specifically, Lunzer claims, "[t]here is no need, then, to associate Lunzer's POTS with her syncope" because "Dr. Steiner did not dispute Lunzer's episodic syncope." (*Id.*). If a claimant has an impairment described in the Listings but they do not exhibit one or more of the findings specified in the particular listing, the ALJ will find that the impairment is medically equivalent if the claimant has "other findings related to [the] impairment that [is] at least of equal medical significance to the required criteria." 20 C.F.R. § 404.1526(b)(1). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

Lunzer appears to be arguing that because she experiences several of the symptoms enumerated in Listing 4.05 with the requisite severity—namely uncontrolled, recurrent syncope or near syncope—and she has been diagnosed with POTS, a condition that could account for those symptoms, her impairment is the functional equivalent of what is escribed in Listing 4.05. *See* (Lunzer's Mem. in Supp. at 22–24). Nevertheless, Lunzer herself quotes Dr. Steiner's assessment that there was a "lack of association between Lunzer's POTS and her syncope," and a "paucity of actual physical findings" of such an association. (*Id.* at 22). To be medically equivalent, Lunzer needs to show that she satisfies "all of the specified medical criteria," including the association between arrhythmia and syncope described in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00F(3)(c). *See KKC ex rel. Stoner v. Colvin,* 818 F.3d 364, 369–70 (8th Cir. 2017) (citing *Sullivan*, 493 U.S. at 531). Because Lunzer fails to establish one or more of the elements required of Listing 4.05, her impairment, no matter how severe, is not medically equivalent. 20 C.F.R. § 404.1526(b)(1).

The Court is not persuaded that a remand is appropriate on the grounds that "[t]he ALJ here made no factual findings and provided no analysis regarding medical equivalency." *See* (Lunzer's Mot. in Supp. at 23). The Eighth Circuit has held that "an ALJ's failure to adequately explain his factual findings is not a sufficient reason for setting aside an administrative finding." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (internal quotations omitted). There is no reversible error when the ALJ does not address a specific Listing or elaborate on his conclusions, as long as the record supports his overall conclusion. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006). As detailed above, the record as a whole supports the ALJ's determination that Luzner did not meet or medically equal Listing 4.05. *See, e.g.,* (Admin. R. at 13–15). Therefore, a remand on these grounds is inappropriate. *See Vance,* 860 F.3d at 1118.

The Court concludes that the ALJ's determination that Lunzer's impairments do not meet or medically equal one of the Listings, including the "cardiac [L]istings" such as Listing 4.05 is supported by substantial evidence. *See* (Admin. R. at 13).

### 2.    Opinions of Treating Physicians[11]

The ALJ assigned no weight to the opinions of Dr. Wiley, Dr. Kim, Dr. Prebonich, or Dr. Pennington. (Admin R. at 22–25). Each of these physicians filled out various forms describing Lunzer's limitations. (*Id.* at 1088, 1463, 1465–68, 1664). Lunzer argues that the ALJ erred by failing to provide controlling or at least substantial weight to these physicians' opinions. (Lunzer's Mem. in Supp. at 1, 24–38). The Court will discuss each of Lunzer's arguments in turn.

---

[11]    Lunzer visited numerous physicians over the course of her alleged disability, and received many opinions about her ability to work. *See, e.g.,* (*id.* at 22). The Court limits its analysis to the four physicians Lunzer identified: Drs. Pennington, Prebonich, Kim, and Willey. (Lunzer's Mem. in Supp. at 1, 24–39).

### a.    Legal Standard

The Social Security Administration ("SSA") gives a treating source's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R § 404.1527(c)(2); *see also Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). But "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks omitted). Further, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (internal quotation marks omitted). A treating physician's opinion that a claimant is disabled or cannot be employed due to his or her impairments should not be credited because that task is reserved to the Commissioner. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

If the SSA does not give the treating source's opinion controlling weight, the SSA must still analyze the following factors: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) whether the opinion is supported; (5) the opinion's consistency with the record as a whole; (6) whether the source is a specialist in the applicable area; and (7) other factors "which tend to support or contradict the opinion." 20 C.F.R § 404.1527(c). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937.

### b.    Dr. Willey

On February 27, 2014, Dr. Willey filled out a checkbox form in which he opined that Lunzer had POTS and dysautonomia which would last more than 45 days and prevented her from performing any employment in the foreseeable future. (Admin. R. at 1664). The ALJ gave no weight to Dr. Willey, noting that Dr. Willey's opinion was not supported by other evidence, namely the fact that "[w]hen [Lunzer was] seen by her therapist, in 2014, she had normal gait and station and ambulated independently." (*Id.*) (citing Admin. R. at 1865). In her memorandum, Lunzer advances no explicit objection to the ALJ's conclusions about Dr. Willey. She does, however, suggest that "[t]he ALJ's reliance on a normal gait during a kidney stone appointment is misplaced—Lunzer had not complained of gait issues, and gait issues would not be an expected result of POTS." (Lunzer's Mem. in Supp. at 31).

First, the report that Lunzer cites provides no support for her claim that "gait issues would not be an expected result of POTS." (*Id.*). Second, opinions about a claimant's ability to work are reserved for the Commissioner, and the ALJ is not required to give any special significance to such a statement, regardless of the source. *See* SSR 96-5p, 1996 WL 374183 at *2; *see also* 20 C.F.R § 404.1527(e). Therefore, the Court finds that the ALJ did not err in affording Dr. Willey's opinion no weight.

### c.    Dr. Kim

On October 2, 2013, Dr. Kim filled out a "Physical Residual Functional Capacity Questionnaire" on behalf of Lunzer, opining, *inter alia,* that in an average working day, Lunzer could only sit or stand for less than two hours, lift less than ten pounds, and would have "significant limitations with reaching, handling, or fingering[.]" (Admin R. at 1465–68). The ALJ gave no weight to Dr. Kim because his opinions were inconsistent with the other medical

15

providers, including Dr. Pennington. Specifically, the ALJ compared Dr. Kim's questionnaire to a nearly identical one filled out by Dr. Pennington, and noted that Dr. Pennington found that Lunzer was capable of occasionally lifting up to ten pounds, rarely lifting up to twenty pounds, and could sit for up to two hours at a time. (*Id.* at 23, 1739–42). Based on this and other similar observations, the ALJ found that the "inconsistency amongst the doctors' opinions undermines the overall persuasiveness of all the opinions. The evidence does not support these opinions." (*Id.* at 23). The Court agrees.

The thrust of Lunzer's argument is that Dr. Kim's opinion is not inconsistent with Dr. Pennington's because both of them suggest that Lunzer is unable to work. *See* (Lunzer's Mem. in Supp. at 30) ("Dr. Kim wrote a letter explaining Lunzer had daily fluctuations of blood pressure and heart rates, a history of syncope, daily migraines, visual disturbances, and chronic fatigue, all of which made it difficult for her to work," and "Lunzer's impairments precluded her from engaging in any substantial gainful activity . . . ."). Even if Dr. Kim's opinions are consistent with Dr. Pennington's, they are still opinions on Lunzer's ultimate ability to work, and should not be given weight. *See Stormo* 377 F.3d at 806 ("treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]" (alteration in original) (internal quotation marks omitted)).

Even if the ALJ chose to give weight to such a conclusory statement from a physician, "[he] may discount or even disregard the opinion of a treating physician . . . where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff*, 421 F.3d at 790. The ALJ documented many places where Dr. Kim's opinions conflicted with

Dr. Pennington's opinions and other medical findings. (Admin. R. at 23). Therefore, this Court finds that the ALJ did not err in affording Dr. Kim's opinion no weight.

### d.    Dr. Prebonich

In a report dated May 31, 2012, Dr. Prebonich stated that Lunzer had become unable to work on June 1, 2010 and was bed-ridden three to five days per week. (*Id.* at 1088). The ALJ afforded Dr. Prebonich's opinion no weight because the June 1, 2010 date of disability predated the alleged onset date Lunzer alleged in her social security application. (*Id.* at 10, 23) (citing Lunzer's reported onset date of September 30, 2010). Additionally, the ALJ found that Dr. Prebonich's assessment was not supported by the record: "On July 22, 2010, she reported doing well and her pain was progressively getting better. She was walking more and much more easily." (*Id.* at 23). The Court finds the ALJ's decision is supported by substantial evidence.

Again, Lunzer's argument centers on the fact that Dr. Prebonich's opinion was in line with other treating physicians because they all believed Lunzer was unable to work. *See*, *e.g.,*(Lunzer Mem. in Supp. at 30) ("Dr. Pennington's opinions are shared by other treating physicians . . . [he] completed a form opining Lunzer was confined to bed 3 to 5 days of the week, had dizziness and syncope issues, and had been unable to work and earn money since June 1, 2010."). To the extent that Dr. Prebonich is offering a conclusory opinion on the ultimate issue of disability, the ALJ is under no obligation to afford that opinion any weight. *See Stormo* 377 F.3d at 806. But even assuming *arguendo* that Dr. Prebonich's opinion was not conclusory, the ALJ gave detailed and sufficient reasons why the evidence did not support it. (Admin. R. at 24) ("[r]ecords from July 2011 . . . show[] she could move all extremities spontaneously. . . [s]he had regular heart rate and rhythm . . . [s]he had good distal pulses"). Because the ALJ properly found

that Dr. Prebonich's opinions were not well-supported by evidence in the record, the Court holds that the ALJ did not err in affording them no weight.

### e.   Dr. Pennington

On several occasions between 2013 and 2015, Dr. Pennington described how Lunzer's conditions impaired her ability to work. *See* (*id.* at 1463, 1742, 1993). As previously mentioned, Dr. Pennington's Physical Residual Functional Capacity Questionnaire from July 20, 2015, stated that in an average workday, Lunzer could only stand/walk for less than two hours and sit for about two hours.  (*Id.* at 24, 1739–42). She would constantly need to elevate her legs and could lift less than ten pounds occasionally and twenty pounds rarely. (*Id.*). The ALJ found that these limitations were not supported by evidence in the record. (*Id.* at 24).

Lunzer argues that "[b]ecause Dr. Pennington's opinions are consistent with the substantial evidence in the record as a whole . . . Dr. Pennington's limitations should be afforded controlling weight." (Lunzer's Mem. in Supp. at 24). Lunzer further claims that "tilt table testing, objective findings, the opinions of other treating sources, and the opinions of lay people . . . and supported by medi[c]ally acceptable clinical and laboratory diagnostic techniques" supported Dr. Pennington's assessment of her limitations. (*Id.*). Although a treating physician's opinion is generally entitled to great weight, such an opinion does not automatically control because the record must be evaluated as a whole. *Hacker,* 459, F.3d at 937. The Court finds that the ALJ properly considered the record as a whole and determined that Dr. Pennington's opinions were unsupported by the record. In his decision, the ALJ articulated a laundry list of documented occurrences that were inconsistent with Dr. Pennington's assessment. *See* (Admin. R. at 24). Specifically, the ALJ found

> When seen in April 2015 . . . [Lunzer's] [p]ulses were normal and she had a normal cardiac rate . . . [she] had normal gait and could ambulate

18

> independently with no psychomotor agitation or retardation . . . [she]
> denied any dizzy spells or difficulty walking. . . ."

(*Id.*). The ALJ did not err in finding that Dr. Pennington's conclusions were not supported by substantial evidence in the record.

Best characterized, Lunzer's next argument is that the ALJ erred in giving more weight to the opinions of the medical expert, Dr. Steiner, than to Dr. Pennington. *See* (Lunzer Mem. in Supp. at 34–38). Lunzer argues "[t]he ALJ's reliance on the opinions of Dr. Steiner . . . is not supported by a thorough review of the record," and that the ALJ did not give a "good reason" for using Dr. Steiner's opinions to "discredit Dr. Pennington's opinions." (*Id.* at 37–38). The Court disagrees and will address both issues.

First, the ALJ properly found that Dr. Steiner's assessment was supported by the record. Ultimately, Dr. Steiner concluded that Lunzer did not have a demonstrable association between her arrhythmias and syncope, which is required for an impairment to meet Listing 4.05. (Admin. R. at 105); 20 C.F.R Pt. 404, Subpt. P, App. 1 § 4.00F(3)(c). In his testimony before the ALJ, he based his opinion on the readings from Lunzer's loop recorder, which was installed to determine if she was experiencing arrhythmias. (*Id.* at 103–05). Dr. Steiner remarked that the loop recorder showed "no episodes of bradycardia and only some episodes of sinus tachycardia." (*Id.* at 103). Additionally, Dr. Steiner examined several of Dr. Pennington's treatment records and found that Dr. Pennington's examinations yielded "normal [results] in regards to pulse and blood pressure." (*Id.* at 104). Based on his readings of Lunzer's loop recorder, the ALJ did not err in finding that Dr. Steiner's opinions were "consistent with the overall body of evidence." (*Id.* at 16).

Second, the ALJ did not fail to provide a good reason for using Dr. Steiner's opinions to discredit Dr. Pennington. In weighing the evidence, it is the ALJ's function to resolve conflicts among the opinions of various physicians. *See Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir.

19

2007). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence . . . ." *Goff*, 421 F.3d at 790. As noted above, both Dr. Pennington and Dr. Steiner had access to the readings from Lunzer's loop recorder. (Admin. R. at 105, 1452–53). However, Dr. Pennington arrived at a conclusion that is contrary to the objective medical evidence. Notably, Dr. Pennington found that Lunzer's arrhythmias were causing her syncope when Dr. Steiner testified that the readings from her loop recorder "showed really no episodes of bradycardia and only some episodes of sinus tachycardia which is . . . normal . . . although rapid." (*Id.* at 103); s*ee also e.g.,* (*id.* at 1668). In March 2011, Lunzer visited the Mayo Clinic with complaints of light-headedness and pre-syncope, but her Holter monitor showed no correlating arrhythmia. (*Id.* at 549–50). In his testimony before the ALJ, Dr. Steiner testified that he had looked at the loop recordings and found "a paucity of actual physical findings to support an ongoing severe problem [that would meet a Listing]. (*Id.* at 105). The opinion of a treating source is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R § 404.1527(c)(2). Because Dr. Pennington's opinion is inconsistent with substantial evidence—notably the readings from Lunzer's loop recorder—the Court finds that the ALJ did not err in affording Dr. Pennington's opinion no weight. Additionally, the Court finds that Dr. Steiner's opinion is consistent with the record as a whole. Considering these factors, the ALJ properly resolved the conflict between the doctors' opinions in favor of Dr. Steiner.

Alternatively, Lunzer argues that "because the ALJ failed to provide good reasons for not affording Dr. Pennington's opinions at least substantial weight, the ALJ's decision should be reversed and . . . remanded to allow the ALJ to reevaluate Dr. Pennington's opinions . . . ."

(Lunzer's Mem. in Supp. at 24). This Court is satisfied that the ALJ's decision on the matter is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See* SSR 96-2p, 1996 WL 374188 at *5. Therefore, a remand for further clarification is unnecessary. *See generally Vance*, 860 F.3d at 1118.

## III.    CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff  Megan C. Lunzer's Motion for Summary Judgment [Doc. No. 12] is **DENIED;**

2.  The Deputy Commissioner of Operations's Motion for Summary Judgment [Doc. No. 14] is **GRANTED**; and

3.  This case is **DISMISSED**


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 16, 2018


*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge